# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **MICHAEL JONES,** | |
| Plaintiff, | |
| v. | Case No. 16 C 10258 |
| **BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS** and **MARK DONOVAN, Individually,** | Judge Harry D. Leinenweber |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

### I. BACKGROUND FACTS

In December 2015, the Chief Operating Engineer for the West Campus of the University of Illinois at Chicago ("UIC") retired. The school posted the opening, which was a civil service position, and the State Civil Service System identified eleven candidates that were qualified and thus eligible for interviews. Nine of those were Caucasian and two were African-American. Plaintiff was one of the two African-American candidates. The Defendant, Mark Donovan ("Donovan"), Vice-Chancellor of Administrative Services to whom the Chief Operating Engineer would report, interviewed all eleven candidates. In March 2016, Donovan selected Anthony Civito, one of the Caucasian applicants, to fill the vacancy.

The selection process was a subjective one and consisted of Donovan's review of the applications and the materials the candidates brought to the interview, and an in-person interview of the candidates.

Neither the Civil Service statutes or rules nor UIC establish any required procedures and rules for the conduct of interviews for the position.  Donovan asked each candidate the same three questions: why they were interested in the position, what relevant experience they had, and what they envisioned doing as chief engineer.  Donovan neither relied on nor reviewed any previous performance evaluations of the candidates.

Mr. Donovan testified that he selected Anthony Civito ("Civito") for the position based on his interview and the materials he brought to the interview which disclosed his experience.  Mr. Donovan justified his selection of Civito on his conviction that Civito was more prepared for the interview than the other candidates, he exhibited initiative, provided thoughtful responses, and articulated concrete plans for improving the department by reducing costs and supervising employees.  Also, according to Donovan, Civito was prepared and brought what Donovan considered to be relevant materials to the interview.

On the other hand, Plaintiff brought only his application and his resume to the interview.  While he discussed his experiences on campus and what he would do such as improving the personal appearances of the engineers and holding them accountable, in Donovan's opinion, he did not put forth any specific plans he would introduce as Chief Engineer.

Plaintiff testified at his deposition that he was comfortable during the interview and was not asked any questions that he thought were inappropriate.  In fact, Plaintiff himself brought up the issue of race in his interview when he suggested to Donovan that he would be the first African-American Chief Engineer and promoting him would be a legacy

for both of them.  Plaintiff further testified that he was aware of no facts to suggest that Donovan did not believe Mr. Civito to be the most qualified candidate.  (Later in an affidavit he suggested that he discovered facts during discovery that suggested that he was more qualified than Civito. Specifically, he learned that he had a higher performance review than Civito.)  Plaintiff's resume showed that he had been promoted on three separate occasions while employed at UIC.  He started out as a Transportation Clerk, was promoted to Utility Laborer, then to Boiler Room Fireman, then to Plant Operating Engineer, and finally to Assistant Chief Engineer.  He graduated from Chicago Vocational High School and took classes at UIC and Triton College but had taken no classes since 1996.  His resume listed the following certificates and licenses: Fundamentals of Supervisory Performance, Skills for Employee Retention, Stationary Engineering, Swimming Pool Operator Fundamentals of HVAC, Basic Electricity, Refrigeration & AC 1, Direct Digital Controls, Generator Operator, and City of Chicago license as a Stationary Engineer.  He also told Donovan that he volunteered at inner city school programs where he suggested that young people should look at the trades as career options.  He kept full records and had customer service skills.  He was concerned about a non-caring staff, that there was no maintenance program, and that the staff lacked professional appearance.  He discussed increased accountability and better purchasing procedures.  He had worked in both the East and West plants and he had commissioned a building known as 630.  He advised that after 30 years on the job he had never been disciplined.

In contrast Civito brought to the interview his application, his resume, his certificates, a synopsis of career accomplishments, a description of repairs he put in place to keep Building 940 running when funding was pulled, a training program he created to train his staff as well as a self-evaluation report from one of the classes he took at UIC. He also brought a letter from the Village Engineer of the Village of Downers Grove to show that had donated time to his community. His resume showed that he had graduated from Prosser Vocational High School, where he had studied HVAC and various trade classes. He also attended classes and received certificates in building operations, electrical, plumbing, and HVAC from Triton College and from the College of DuPage, some as late as 2008. He continued taking classes through Local 399 until 2010 and since that time he has taken classes in Peerless boilers and management. He started at UIC as Plant Operating Engineer in 2000. Prior to that he had been Senior Head Engineer for Professional Business Providers at Midway Airport. In 2012 he was promoted to Assistant Chief Engineer at UIC at the East Campus. He had volunteered to work at the West Campus when a vacancy occurred. Further he discussed operations and what he would do as Chief Engineer and how his experience was important in reviewing blueprints, following orders and making sure contractors were handling projects properly.

## II.  **THE EEOC COMPLAINT**

Plaintiff filed a Complaint with the EEOC in April 2016 charging race discrimination based on the appointment of Civito. In response to the question of why he believed it to be race discrimination, he stated

that "[a] minority has never been promoted to the position of Steam & Power Plant V (formerly called Chief Plant Operating Engineer)." He also stated that Civito had been transferred from the East Side Heat Light & Power Department where he and Plaintiff worked, to the West Side which was the location of new position. He claims that the reason stated by Defendants was to provide cross-training. This cross-training was provided to Civito but not to Plaintiff. He further claimed that Civito was less senior to him as an UIC employee.

The University's response was that seniority is not a factor under the rules and for Civil Service promotions. The response further stated that Civito had been much better prepared for the interview. It further noted that while both Plaintiff and Civito were Assistant Chief Engineers, Plaintiff had chosen to work the midnight shift which is basically a caretaker role, involving supervision of a small crew and he had little experience with the West Campus where a key part of the West Campus, the UIC Hospital was located. It then noted that, in contrast to Plaintiff, Civito had daytime experience on the East Side supervising larger crews and conducting training, and two years prior, he had requested the opportunity to take a vacated position on the West Side, a lateral move which enabled him to learn the operations of the West Campus.

UIC also acknowledged to the EEOC that it had promulgated a Statement of Reaffirmation, Affirmative Action in Employment, which provided that "UIC adheres to the principles of equal employment opportunity and nondiscrimination in all aspects of employment,

- 5 -

recruitment, hiring, promotions and development of our employees. Our hiring and employment policies are devised to promote this commitment."

### III. **THE COMPLAINT AND SUMMARY JUDGMENT MOTION**

The Plaintiff filed a Complaint in this Court against The Board of Trustees and against Mark Donovan alleging discrimination in employment, based on failure to promote because of his race. The suit against the Board alleges violations of Title VII and Section 1981 and Section 1983, and the suit against Donovan alleges violation of Section 1981. The Defendants have moved for summary judgment. "Because the elements and methods of proof are the same regardless of whether a discrimination claim is brought under Title VII or Section 1983, the summary judgment analysis is also the same for claims under both statutes." *Figueroa v. Village of Melrose Park,* 127 F. Supp. 3d 905, 907 (N.D. Ill. 2009).

In *Ortiz v. Werner Enterprises, Inc.,* 834 F. 3d. 762, the Seventh Circuit changed the nomenclature involved in employment discrimination cases, eliminating the sorting of evidence into the separate categories of indirect and direct evidence. From that case forward, the district courts were instructed to place all pieces of evidence into a single pile which must be evaluated as a whole. The correct legal standard is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765. The so-called direct and indirect evidence are terms that in reality are other names for direct and circumstantial evidence and are

to be weighed as stated in the Seventh Circuit pattern instruction that requires the fact finder to consider both direct and circumstantial evidence in evaluating whether plaintiff has made a case of discrimination. The question is whether the plaintiff has put forth sufficient evidence, direct and circumstantial, to preclude summary judgment. *Sylvester v. SOS Children's Villages Illinois, Inc.,* 453 F.3d 900, 903 (7th Cir. 2006).

Since Donovan was the Board's actor, the evidence is the same for the Plaintiff's two cases with the exception that Plaintiff cites an early 1990's case brought against the UIC by a group of African-Americans for failure to promote within the Heat and Power Division based on race. He also cites an incident that occurred in 2014 that involved the hanging of a noose in a Transportation Department Garage, which led to racial sensitivity training for the affected department. Because neither of these involved Donovan, they are only cited with respect to the Board.

The evidence that applies to both Defendants is the so-called cross-training that Civito received, which, according to Plaintiff, demonstrates that Civito was the beneficiary of favoritism because he had been given the opportunity to participate in the cross-training program on the West Campus, which Plaintiff had not been told was available. He also argues that Defendants' reason for promoting Civito, a decision based in part on the cross-training, was inconsistent with Donovan's deposition in which he testified that his reason for selecting Civito was his interview in addition to his West Campus experience. Plaintiff also argues the subjective promotion practice used by Donovan

in which he alone interviews the candidates lacks safeguards and checks and balances to prevent discrimination. He also argues that Plaintiff's performance evaluation for his previous position of Assistant Chief Operating Engineer was higher than the performance evaluation for Civito for the same position of Assistant Chief Engineer.

Defendants respond by arguing that Plaintiff has not come up with any evidence that he was more qualified than Civito or that Donovan's (and the Board's) decision to hire Civito over Plaintiff was based on racial animus. The Defendants point out that Donovan was not aware of the performance evaluations and did not consider them because he questioned their reliability and because Civito and Plaintiff were applying for a completely different position, with significant administrative, supervisory and planning responsibilities. Nevertheless, both received the same summary grade of "meets expectations." The Defendants further argue that there was no so-called cross-training program. Civito received cross-training because he requested the opportunity when he heard of the temporary vacancy at the West Campus. Donovan felt it was relevant because requesting to work in the West Campus (where the University Hospital is) showed initiative as well as valuable experience. Finally, Defendants take issue with Plaintiff's interpretation of Donovan's interview notes. They note that Donovan was not asked a single question about them during his deposition.

## IV. DISCUSSION

The key question in this employment discrimination lawsuit is whether Donovan, the decision maker, legitimately considered Civito to

be more qualified than Plaintiff for the position of Chief Engineer. As has been stated repeatedly, courts do not sit as super personnel departments to second guess employers' business decisions: The only question is whether the reason given for the employment decision is pretext. *Stewart v. Henderson,* 207 F.3d 374, 378 (7th Cir. 2000). Plaintiff basically rests his case on his contention that he scored higher than Civito on the performance reviews for their previous positions, and therefore he was more qualified, and that Donovan used the cross-training matter as a subterfuge to justify his discriminatory choice. However, a review of the interviews of Plaintiff and Civito leads to the conclusion that Donovan was entitled to find that Civito was the more qualified of the two. He brought more evidence of his prior experience to the interview than Plaintiff brought. He also had the previous experience of cross-training that Plaintiff lacked. This alone would make Civito on paper more qualified than Plaintiff. In response to Civito's cross-training, Plaintiff contends unconvincingly that this was a "program" which was hidden from Plaintiff to give Civito a leg up. However, there was no evidence that this was a "program" much less one that was hidden away. The evidence instead shows that Civito took it upon himself, when he found out that there was a temporary opening on the West Campus, to apply for it. In contrast, Plaintiff did not make any effort to see if there might be any such opportunity available. Donovan stated in contrast to Civito's initiative, Plaintiff

was happy as Assistant Plant Operator Engineer to work nights which was a less demanding job than the day shift.

In addition, Civito had held several positions, both within the University and without, that were considered by Donovan to be very relevant to the Chief Engineer's job. In response to a direct question at Plaintiff's deposition, whether he had any evidence of racial animus or that race had anything to do with the decision to appoint Civito, Plaintiff responded that he did not have any such evidence. He later sought to back off from this conclusion in his affidavit stating that he later learned of evidence that Donovan did discriminate against him when he found out that he had a more favorable performance review than Civito, and that Defendants had changed their position on the importance of the so-called cross-training issue. With respect to the performance reviews the evidence was undisputed that Donovan did not consider them, did not know of them, and gave as his reason that he did not find them helpful. It is also a fact that there was minimal difference between the two as both were found to be "meeting expectations." It might have been different if one was clearly superior to the other, such as an "exceeds expectations" versus "fails to meet expectations," but that was not the case.

Plaintiff also argues that the failure in the past to promote an African-American to the position as Chief Engineer at UIC proves discriminatory intent. However, Plaintiff has failed to provide any details regarding past promotions, such as the number of African-Americans in the candidate pool at the time of the previous promotions,

who the decision makers were and when the decisions were made. Thus, to conclude that UIC, contrary to its stated policy, had a policy of not promoting African-Americans to the Chief Engineer position is pure speculation which does not produce a genuine issue of fact for trial. *Jordan v. Summers,* 205 F.3d 337, 344 (7th Cir. 2000).

Finally, the so-called "noose" incident, while reprehensible, has no relation to Donovan or his department. Nor does a lawsuit against the University that occurred more than twenty-five (25) years ago have any relation to the current situation at UIC.

While Plaintiff was clearly qualified for the position (as were the nine other applicants), it was, under the evidence put forth in these Motions, not an unreasonable decision for Donovan to promote Civito over Plaintiff.

## V. **CONCLUSION**

In summary, the only evidence Plaintiff put forth in opposition to the Motions for Summary Judgment is the subjective nature of Donovan's decision-making process and Plaintiff's arguably higher performance evaluation. Against this the Defendants have shown that Civito gave a superior interview and demonstrated greater relevant experience, which included the stint at the West Campus. Subjective promotion practices while susceptible to abuse are nonetheless legal. *EEOC v. Sears, Roebuck & Co.,* 839 F.2d 302, 332 (7th Cir. 1988). Plaintiff sought to make this asset into an accusation of discrimination but the evidence does not support this. For the reasons stated herein, Defendant's Motions for Summary Judgment are granted.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 8/22/2018